IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NORRIS & ASSOCIATES, P.C.,         )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )
                                   ) CIVIL ACTION NO. 98-G-0621-S
DANKA INDUSTRIES, INC.,            )
                                   )
        Defendant.                 )

ENTERED
JAN 1 4 1999

MEMORANDUM OPINION

This cause centers around a lease numbered 6258150 entered into by plaintiff lessee Norris & Associates, P.C. [hereinafter NORRIS][1] and lessor American Business Credit Corporation[2] [hereinafter ABCC], dated March 19, 1996, by which NORRIS leased one Kodak ImageSource 85, #10091841 [hereinafter IS85] and one Kodak Finisher, #8876475. The lease was signed in cursive by "Robert Norris, as President" directly beneath the following words printed in bold large type: **"THIS LEASE IS NOT**

---

[1] "NORRIS" is used throughout this opinion to denote plaintiff Norris & Associates, P.C. Robert McKim Norris is referred to by name or as Mr. Norris.

[2] American Business Credit Corporation was the funding agent for Danka Industries, Inc.



**CANCELLABLE."**[3] Supplier was defendant Danka Industries, Inc., since succeeded by Danka Office Imaging Company [both hereinafter Danka], movant.

The sales order, invoice #35193, also signed by Robert Norris, showed that by the deal negotiated between the parties the lease on a Canon NP8530 was closed out with that equipment to remain with NORRIS; 18 months of lease payments [were to be] paid in advance by Danka Industries; and "Danka Industries [would] pay up to $2,000 for installation modifications necessary to install Kodak. Norris (corporation) will provide original invoice to Kathy Lancaster." Page two of the order has a list of terms, part of which follows:

> (1) This document shall serve as a financing statement for purposes of filing in accordance with the Uniform Commercial Code.
>
> ...
>
> (2) Seller retains title to all equipment and supplies hereunder until the purchase price is paid in full.
>
> (3) In the event of suit, Seller shall be entitled to all remedies under the Uniform Commercial Code. In addition, Buyer agrees to pay any legal fees or other costs incurred in any action to collect the

---

[3] Part of Mr. Norris's signature overlaps these printed words.

>       debt due thereunder, whether in the event of suit
>       or otherwise.
>
> ...
>
>       This is a BINDING ORDER, not subject to
>       cancellation. No trials are accepted. This order
>       cannot be changed except in writing by an officer
>       of Seller.

The signature of the representative of the buyer at the end of the second page is indiscernible.

Robert Norris signed the equipment, maintenance, and supply annual agreement, numbered 17006, the contract between NORRIS and Danka by which Danka was to provide supplies for and service the Kodak IS85 and Canon 8530 for a monthly charge. The service agreement provided that the written document represented the "entire agreement" of the parties.

The ABCC/NORRIS lease and the NORRIS/Danka maintenance agreement were entered into following negotiations. Kathy Lancaster, sales manager of Danka, prepared and submitted to NORRIS a proposal[4] for NORRIS on February 20, 1996. The proposal included a "CURRENT SITUATION ANALYSIS" as compared to the "PROPOSED SITUATION ANALYSIS." As part of the proposal Danka agreed to pay in full the lease NORRIS had on the Canon NP8530

---

[4] Ms. Lancaster testified that Mr. Norris requested that she put together a proposal.

and to allow NORRIS to keep the machine on site for use. The proposal broke down the "PRESENT MONTHLY COST" of copies at a cost of $.0395 per copy as compared to $.0085 per Danka Kodak copy for the first 90 days and $.0110 per copy thereafter. The proposal set forth the proposed monthly cost for the Kodak equipment for the 60 months of the lease, breaking the cost down into steps, and set forth the specifications of the proposed equipment.

Between the time that Mr. Norris received the proposal and the time the contracts (leases) were signed the following communications were sent:

1) February 27, 1996, letter from Ms. Kathy Lancaster to Mr. Robert Norris with additional incentives amounting to $9,600 savings to NORRIS to complete the deal and reference to what the deal meant to her personally in terms of her year-end finish with Danka;[5]

2) February 29, 1996, letter from Robert McKim Norris, Jr. to Ms. Kathy Lancaster acknowledging her attempts to close the deal, recognizing her professionalism and sincerity, and indicating he was "not ready to make the move at this time;"

3) March 8, 1996, letter from Kathy Lancaster to Mr. Robert Norris with a final offer extending the outstanding offer by $5,000 in an effort to

---

[5] According to Ms. Lancaster this was nothing more than sales puffing. The sale was not important to her personally for she had already accepted another job in Dallas.

4

        complete the deal by the end of her year ending on March 31st; and

4)    A business card of Ms. Lancaster's left at Mr. Norris's office (date unknown) with the words: "Robert, $6,000!!! <u>Help please</u> Kathy!

        The only other documents before the court are copies of the Danka "Peace of Mind" guarantee offering a lifetime performance guarantee on equipment maintained and serviced under a Danka "Equipment, Maintenance and Supply Agreement" (such as the one covered in the NORRIS/Danka lease agreement) and a guarantee of emergency service within four hours.

        History leading up to the leases shows that sometime in January or February 1996 NORRIS needed to complete a high volume copy job totaling some 15,000 to 20,000 pages. Because of a service problem with the NORRIS Canon,[6] Danka offered to let NORRIS complete the high volume job on machines at its office in Birmingham, Alabama. NORRIS accepted the offer. Thereafter Kathy Lancaster, a Danka salesperson, approached Mr. Robert Norris about leasing a Kodak IS85 copying machine capable of

---

[6] See page 2 of the opinion. Disposition of the Canon 8530 was included in the Danka package.

handling high volume jobs like the one completed at the Danka office.[7]

Mr. Norris maintains that when the time came to replace his copying equipment he was interested in replacements with digital capability and that Ms. Lancaster indicated to him that the equipment was not available.[8] He does admit by deposition testimony, however, that at the time of his first meeting with Kathy Lancaster **he knew** digital technology was being offered by somebody. He also **knew** that the Kodak IS85 did not have digital

---

[7] Ms. Lancaster testified she was given the lead by Mark Woodward, one of Danka's lead field engineers, who had made the mass volume of copies for NORRIS.

[8] Ms. Lancaster denies that Mr. Norris ever mentioned digital technology. She testified that his primary concerns were volume and speed. She never considered placing with NORRIS a Konica 7050 copier (mentioned by Robert Norris in his deposition testimony) which could have been secured through another Birmingham Danka office because the Konica 7050 does not offer high volume, mass production. She is uncertain whether connectivity was available with the Konica 7050 at the time she was dealing with NORRIS. Ms. Lancaster testified that Mr. Norris never had a conversation with her concerning connectivity. Had he mentioned that desire she could have worked out something with the other Birmingham Danka office to lease him equipment of that type available on the market and would have received a larger commission on that lease than on the one she received on the NORRIS transaction. She strongly maintains that you can't have both speed and connectivity and that Mr. Norris's expressed interest was in speed and high volume.

capability, admitting knowledge of that fact twice in his deposition.

According to Mr. Norris he signed the lease as a favor to Ms. Lancaster. Although the document expressly states that it is not CANCELLABLE, Mr. Norris maintains that Ms. Lancaster led him to believe that he could return it in 60 days if he didn't like it[9] and that this assertion was confirmed by salesman John Mitinger.[10] Mr. Norris did not read the ABCC/NORRIS lease prior to signing[11] it and has testified he did not believe he was bound by it, despite the fact that he has a legal education and practiced law in Alabama from 1976 to 1991.

---

[9] Ms. Lancaster denies this, testifying that NORRIS had to make modifications to its office to accommodate the larger machine. The fact that Danka agreed to pay up to $2,000 for any kind of modifications indicates that it did not consider returnability of the machine within 60 days an option. The lease agreement which Mr. Norris signed specifies that "[n]o trials are accepted."

[10] There is nothing in the record from Mr. Mitinger to substantiate this claim.

[11] It would have been impossible to sign the ABCC/NORRIS lease without noticing the large, bold typed words "THIS LEASE IS NOT CANCELLABLE" directly above the signature line. As noted earlier, Mr. Norris's signature overlapped the printed words specifying that the lease was not cancellable. Reading and signing the NORRIS/Danka lease is not mentioned in this context.

Attempts by NORRIS to contact Danka about the Kodak IS85 proved unsatisfactory to NORRIS. Ms. Lancaster had been promoted to a larger market. According to Mr. Norris, Mr. Mitinger explained that digital technology was available, but not to Ms. Lancaster. Mr. Mitinger arranged a demonstration of a digital machine. Mr. Norris expressed interest in the machine and according to him Danka was supposed to get back with him. It didn't. Dunning notices from ABCC and further negotiations with Danka proved fruitless in changing NORRIS's dissatisfaction with the Kodak IS85, in exchanging the Kodak IS85 for another one with digital capabilities, or returning the Kodak IS85. According to Mr. Norris, NORRIS was left to its own resources to resolve the lease issue with ABCC.

The following facts, however, remain: Mr. Norris did sign the lease with ABCC on behalf of NORRIS; NORRIS used the $16,800 rebate from Danka to make the first several payments to lessor ABCC on the Kodak IS85; NORRIS made no further payments on the Kodak IS85 after exhausting the $16,800 rebate from Danka; and, NORRIS possesses and uses both the Kodak IS85 and the Canon 8530.

Plaintiff filed suit in federal court on March 17, 1998, on the following counts:

Count I--Fraud in violation of the common law of Alabama or under the provisions of Code of Alabama § 6-5-100[12] and § 6-5-101[13]--NORRIS justifiably relied on false representations of Ms. Lancaster about the copier and finisher to its detriment and was injured as a result;

Count II--Fraudulent Suppression in violation of the common law of Alabama and Code of Alabama § 6-5-102;[14] --Danka suppressed material facts concerning the compatibility and connectivity of the Kodak IS85 as well as other workable technology using digital technology available through Danka; and

---

[12] "Fraud; right of action. Fraud by one, accompanied with damage to the party defrauded, in all cases gives a right of action."

[13] "Fraud; misrepresentation of material fact. Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."

[14] "Fraud; suppression of material fact. Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."

      Count III--Deceit/Fraudulent Deceit in violation of the common law of Alabama and Code of Alabama § 6-5-103[15] and § 6-5-104.[16]

All counts deal with fraud and misrepresentation. The elements of a misrepresentation claim are: 1) a misrepresentation of material fact; 2) made willfully to deceive, recklessly, without knowledge, or mistakenly; 3) which was **reasonably relied** on by the plaintiff under the circumstances; and 4) which caused

---

[15] "Willful misrepresentation--Deceit. Willful misrepresentation of a material fact made to induce another to act, and upon which he does act to his injury, will give a right of action. Mere concealment of such a fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of a falsehood constitutes an essential element. A fraudulent or reckless representation of facts as true, which the party may not know to be false, if intended to deceive, is equivalent to a knowledge of the falsehood."

[16] "Willful deceit with intent to induce injury or risk.
(a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

(b) A deceit within the meaning of this section is either:

(1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
(2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
(3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or
(4) A promise made without any intention of performing it."

damages as a proximate result. *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997). The elements of a suppression claim are: 1) a duty to disclose the facts; 2) concealment or nondisclosure of material facts by the defendant; 3) inducement of the plaintiff to act; and 4) action by the plaintiff to his injury. *Foremost*, at 423. A deceit claim requires a willful or reckless misrepresentation or a suppression of material facts with an intent to mislead. *Lewis v. Roberts*, 630 So. 2d 355, 357 (Ala. 1993), *reh'g denied* (1993). The *Lewis* court, at 357, went further by stating the following:

> To be liable for fraudulent concealment, one must either be under an obligation to communicate arising either from a confidential relationship or from the particular circumstances of the case or knowingly conceal a material fact with intent to deceive. *Cornelius v. Austin*, 542 So. 2d 1220 (Ala. 1989).

The testimonies of Mr. Norris and that of Ms. Lancaster conflict. The testimony of Mr. Kerry Brett Whitlock sheds no light on the truthfulness of testimonies of either Mr. Norris or Ms. Lancaster. Mr. Whitlock admits signing an incorrect affidavit, expecting someone else to correct it. He admits he does not know **when** the meeting with Mr. Norris, Ms. Lancaster, and Terry Duncan took place. His testimony does not establish that Ms. Lancaster's actions misled NORRIS into a commitment. No

11

affidavit is on record from Mr. Mitinger who supposedly was privy to conversations between Mr. Norris and Ms. Lancaster.

Fortunately it is unnecessary to sift through their testimonies for the truth. In reaching its decision the court has relied on the present law and written documents which have been entered into evidence. Mr. Norris attacks the validity of those documents. In considering the merits of the instant case the court notes that Mr. Norris has been trained in the law and practiced law in this state for 15 years. He, more than the average citizen, knows the importance of **not** entering into contracts without fully understanding their contents and the obligations by which he is bound thereby. The court is appalled by Mr. Norris's statements that he neither read the ABCC/NORRIS lease nor felt bound by its contents. NORRIS's obligations under the ABCC/NORRIS leasing contract are the direct result of Mr. Robert Norris's carelessness and neglect in entering into the leasing arrangement. Applicable to his actions are the following comments of the Alabama Supreme Court in *Torres v. State Farm Fire & Casualty Company*, 438 So. 2d 757, 758-59 (Ala. 1983):

> Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a **concomitant duty** on the part of

the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable[17] under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. *Bedwell Lumber Co. v. T & T Corporation*, 386 So. 2d 413, 415 (Ala. 1980). (Emphasis added.)

The court finds that the following passage from *Munroe v. Pritchett*, 16 Ala. 785, 789 (1849), quoted in *Torres, 438 So. 2d at 759,* aptly applies to Mr. Norris and the case at bar and binds NORRIS through the agency relationship:

If the (lessee) blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "*volunti non fit injuria.*[18]"

The present "reasonable reliance" standard under Alabama law established by *Foremost* allows "the factfinder greater flexibility in determining the issue of reliance based on all the circumstances surrounding a transaction, including the mental capacity, **educational background, relative sophistication,**

---

[17] Although the standard for misrepresentation under Alabama law later changed to "justifiable reliance," rather than "reasonable reliance" in *Hickox v. Stover*, 551 So. 2d 259 (Ala. 1989), the court returned to the "reasonable reliance" standard in *Foremost Ins. Co. v. Parham*, 693 So. 2d 409 (Ala. 1997).

[18] To a willing person a wrong is not done.

13

and bargaining power of the parties (emphasis added)." *Foremost*, 693 So. 2d at 421. Of particular note is the following language from *Foremost*:

> [A] return to the "reasonable reliance" standard will once again provide a mechanism, which was available before *Hickox*, whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.[19]

693 So. 2d at 421.

Another fundamental flaw in plaintiff's fraud and misrepresentation counts discounting the reliance element is Mr. Norris's **admission** that he **was aware** of digital technology and connectivity **prior to** the time he leased the Kodak IS85 copier from Ms. Lancaster. Too, he **was aware** that Danka's other Birmingham office leased Konica 7050 copiers. Because of agent Robert Norris's prior knowledge of digital technology NORRIS cannot claim it **reasonably relied** on what Ms. Lancaster said or that she induced it into entering the lease agreements. *See Bedwell Lumber Co. v. T & T Corp.*, 386 So. 2d 413, 415 (Ala.

---

[19] In the case at bar Mr. Norris made a deliberate decision to ignore the written contract terms.

14

1980) ("[W]here a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act thereon.") Nor can NORRIS claim that it had a special confidential relationship with Ms. Lancaster, requiring her to disclose anything to it. Mr. Norris does not claim a special relationship with Ms. Lancaster and nothing in the record indicates anything more to their relationship than that of seller/buyer for a one-time lease transaction of the IS85.

For the reasons set forth in this opinion the court holds that the defendant is due summary judgment as a matter of law on all counts. The court further holds that pursuant to paragraph 3, page two of the leasing agreement, plaintiff is obligated to pay all legal fees and costs incurred in this action.

An order consistent with this opinion is being entered contemporaneously herewith.

DONE and ORDERED this 14th day of January 1999.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.